**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION**

Lance L. Hespe,                                        Case No. 3:13CV1532

          Plaintiff

      v.                                        **ORDER**

The Hartford,

          Defendant

      In this action under the Employee Retirement Income Security Act (ERISA), plaintiff Lance Hespe challenges the denial of insurance benefits. He alleges that defendant, the Hartford Life and Accident Insurance Company, acted arbitrarily and capriciously in deciding that he is not disabled from performing any work – and thus concluding that he is not eligible to receive life-insurance benefits without paying a premium.

      Now pending is Hartford's motion for judgment on the administrative record. (Doc. 12). For the reasons that follow, I grant the motion.

**Background**

      Plaintiff worked at Sauder Woodworking Company in Archbold, Ohio, from 1995 to May 26, 2010. He participated in Sauder's employee-welfare plan, which gave him access to life insurance and long-term-disability (LTD) benefits. To fund those benefit plans, Sauder purchased two separate insurance polices from Hartford.

**A. The Insurance Policies**

Sauder's LTD policy governs when a "disabled" employee is entitled to receive disability benefits. (Doc. 11-1 at 20). Under the policy, a "disabled" employee is one who, *inter alia*, is:

> 1) "prevented from performing one or more of the Essential Duties of . . . any occupation for which You are qualified by education, training or experience"; and
>
> 2) "has an earnings potential greater than the less of" two sums defined in other sections of the policy.

(*Id.*).

The LTD policy thus provides benefits to an employee who can perform some work, provided that his or her wages do not exceed the policy's earnings threshold.

Sauder's life-insurance policy contains a "waiver of premiums" provision that allows disabled employees to receive life insurance without paying a premium. In contrast to the LTD policy, the life-insurance policy defines "disabled" without reference to an earnings requirement:

> Disabled means you are prevented by injury or sickness from doing any work for which You are, or could become, qualified by: 1) education; 2) training; or 3) experience.

(Doc. 11-2 at 15).

Both policies grant Hartford  "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions" in the policies. (Doc. 11-1 at 20; Doc. 11-2 at 22).

### B. Plaintiff's Disability

Plaintiff began experiencing lower-back pain in April, 2010. He initially sought treatment from an orthopedic specialist, Dr. David Beeks. Despite taking pain medication, plaintiff continued to experience persistent back pain. In August, 2010, plaintiff underwent fusion surgery to correct

his lumbar spondylosis. Although the surgery proceeded without incident, plaintiff reported continuing back pain.[1]

Having been out of work for nearly seven months, plaintiff applied to Hartford for LTD benefits in December, 2010. Hartford determined that plaintiff was disabled from working in his former position and granted his application. Thereafter, in April, 2011, Hartford approved plaintiff's claim for premium-waiver benefits. In reaching that decision, Hartford explained that it had relied on Dr. Beeks's opinion that plaintiff was unable "to perform any occ[upation] even on a part time basis." (Doc. 10-8 at 61).

Hartford's findings entitled plaintiff to receive LTD and premium-waiver benefits through December, 2012. To receive benefits after that date, plaintiff had to establish that he was still disabled.

### 1. Initial Termination of Plaintiff's Benefits

In June, 2012, Hartford began re-examining plaintiff's case to determine if he was still disabled. As part of its inquiry, Hartford asked Dr. Beeks whether plaintiff had any work-related "restrictions and limitations," and whether plaintiff "could perform a Sedentary occupation . . . on a regular basis 8 hours per day." (Doc. 10-2 at 1).

Dr. Beeks, who had previously opined that plaintiff could not perform any work, now concluded plaintiff was capable of sedentary work, subject to his inability to: 1) sit for more than a half-hour at a time; 2) stand for more than two hours during an eight-hour shift; and 3) walk more than two hours per day.

---

[1] Additional medical evidence in the record shows that plaintiff still from spasms, constant back pain, and occasional numbness and loss of function in his left leg.

Dr. Beeks also reported that plaintiff was "unable to work 8 hours continuous." (Doc. 10-6 at 77). In an effort to clarify that apparent ambiguity, Hartford telephoned Dr. Beeks's office. Someone in the office, though not Dr. Beeks himself, told Hartford that plaintiff "has no restrictions on finger/handle/feel" and "could work [an] 8 [hour] day," though plaintiff "cannot sit continuously for 8 [hours]." (Doc. 10-1 at 31).

Hartford also considered an Employability Analysis Report to determine plaintiff's "current employability." (Doc. 10-5 at 100; Doc. 10-6 at 1-33). According to that report – which was prepared in September, 2012 and incorporated the work-related restrictions Dr. Beeks had identified – there were seventeen jobs within the "closest" level that plaintiff could perform and ninety jobs within the "good" level. (Doc. 10-6 at 1).

On September 24, 2012, Hartford notified plaintiff by letter that it would be terminating his premium-waiver benefits. (Doc. 10-8 at 43-47). Hartford explained that, in light of Dr. Beeks's opinion and supporting records, plaintiff was not "disabled" because he was "no longer unable to perform any work." (*Id.* at 46).

One week letter, Hartford informed plaintiff that it would also terminate his LTD benefits. (Doc. 10-1 at 90-97). Based on Dr. Beeks's treatment notes, the restrictions Beeks placed on plaintiff's ability to work, and the September, 2012, employability report, Hartford determined that plaintiff could do six different jobs, each of which paid between $2,880 to $3,518 per month, which apparently exceeded the LTD policy's earnings threshold. (*Id.* at 93).

## 2. Plaintiff's Appeal

Plaintiff appealed the termination of his premium-waiver and LTD benefits. In support thereof, he submitted a Functional Capacity Examination (FCE) prepared in October, 2012.

4

According to the FCE, plaintiff was "incapable of sustaining the Sedentary level of work for an 8-hour day." (Doc. 10-5 at 80). However, the FCE also showed plaintiff could sustain a four-hour shift of sedentary work, and that he could occasionally sit, stand, squat, and climb stairs.

Plaintiff also submitted a letter and a medical source statement, both dated November 16, 2012, from Dr. Kellee Gooden, his pain-management specialist. Dr. Gooden opined that plaintiff's problems walking and standing "affect[ ] his ability for gainful employment." (*Id.* at 87). She then observed that plaintiff's "legs also swell, requiring him to elevate his feet often." (*Id.*). Finally, Dr. Gooden noted that plaintiff's condition was unlikely to improve without "more aggressive interventions[.]" (*Id.*).

In her Medical Source Statement of Ability To Do Work-Related Activities, Dr. Gooden found, *inter alia*, that plaintiff could: 1) lift up to twenty pounds occasionally; 2) carry up to ten pounds occasionally; and 3) sit for one hour at a time and either stand or walk for fifteen minutes without interruption. (Doc. 10-5 at 471-476).

### 3. Proceedings Before the Social Security Administration

While the appeal was pending, the Social Security Administration (SSA) – to which plaintiff also applied for disability benefits[2] – determined that plaintiff was disabled from performing "substantial gainful activity" and awarded him disability insurance benefits. (Doc. 10-5 at 60-70).

The administrative law judge (ALJ) presiding over plaintiff's case found that plaintiff had the residual functional capacity (RFC) to perform sedentary work, subject to: 1) limitations generally consistent with those Drs. Beeks and Gooden had identified; and 2) the restriction that plaintiff "must recline to elevate his legs for more than two hours of each workday." (*Id.* at 63).

---

[2] The  LTD policy required plaintiff to apply for Social Security benefits. (Doc. 11-1 at 18).

5

However, the ALJ also found that there were "no jobs that exist in significant numbers in the national economy that [plaintiff] can perform," given his "need to recline with his legs elevated," (*Id.* at 69).

### 4. Final Termination of Premium-Waiver Benefits

In February, 2013, Hartford reinstated plaintiff's LTD benefits but affirmed the denial of his premium-waiver benefits.

Regarding the LTD benefits, Hartford explained that, "[b]ased on our review [of] additional information received and generated on appeal it was determined that the information in [plaintiff's] file supports Disability under the [LTD] Policy." (Doc. 10-2 at 44).

With respect to premium-waiver benefits, however, Hartford concluded that plaintiff "has the physical capacity to perform at least sedentary demand level work on a part time basis (up to 4 hours per day)." (Doc. 10-8 at 24). And based on a "previously administered vocational analysis," Hartford found that plaintiff was qualified to work as a "Microfilming Document Preparer, Assignment Clerk and Routing Clerk." (*Id.*).

Hartford acknowledged the ALJ's finding that plaintiff was disabled. But the company explained that "it is possible for an individual to qualify for [Social Security] benefits, but not qualify for [premium-waiver] benefits . . . because the standards governing these private and public benefits are different in critical ways." (Doc. 10-8 at 23-24). In particular, Hartford noted that the SSA "measures a claimant's condition against a unique set of federal criteria such as 'substantial gainful activity' and 'relevant work'" (*id.*), whereas the life-insurance policy measured disability against plaintiff's ability to perform any work at all.

Having exhausted his administrative remedies, plaintiff filed this lawsuit.

6

**Discussion**

ERISA permits an employee who has been denied benefits under an employee-benefit plan to challenge that decision in federal court. 29 U.S.C. § 1132(a)(1)(B).

"The general rule is that [the court] reviews a plan administrator's denial of ERISA benefits *de novo.*" *Moon v. Unum Provident Corp.*, 405 F.3d 373, 378 (6th Cir. 2005). But in cases like this one, where the plan expressly grants the administrator discretion to determine eligibility for benefits and interpret the policy's terms, the arbitrary-and-capricious standard of review applies. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)

"The arbitrary and capricious standard is the least demanding form of judicial review of administrative action." *Farhner v. United Transp. Union Discipline Income Prot. Program*, 645 F.3d 338, 342 (6th Cir. 2011).

Under that standard, I must uphold the administrator's decision if it is the result of a "deliberate, principled reasoning process," "supported by substantial evidence," and "based upon a reasonable interpretation of the plan." *Glenn v. Metlife*, 461 F.3d 660, 666 (6th Cir. 2006), *aff'd on other grounds*, 554 U.S. 105 (2008). Indeed, I must uphold the denial of benefits even if the evidence supports another permissible outcome. *Davis v. Kentucky Fin. Cos. Ret. Plan*, 887 F.2d 689, 693 (6th Cir. 1989).

In reviewing Hartford's decision, I may also consider "potential conflicts of interest, including situations where the plan administrator is also the payer of benefits." *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008). Such a "structural" conflict of interest "is just one factor" to consider in deciding whether the administrator abused its discretion. *Id.* at 115.

7

## A. Plausibility of Hartford's Decision

Hartford terminated plaintiff's premium-waiver benefits after "review[ing plaintiff's] file in its entirety" and concluding that he "has the physical capacity to perform at least sedentary demand level work on a part time basis[.]" (Doc. 10-8 at 24).

A great deal of evidence in the administrative record supports that conclusion.

Most importantly, plaintiff's treating physicians consistently opined that he is capable of performing sedentary work or physical activities consistent with such work. Plaintiff's orthopedic specialist, Dr. Beeks, concluded that plaintiff "could perform a Sedentary occupation . . . on a regular basis 8 hours per day." (Doc. 10-7 at 28). Beeks' records also specified that, while plaintiff cannot sit continuously during an eight-hour shift, he had "no restrictions on finger/handle/feel[.]" (Doc. 10-1 at 31).

Dr. Gooden's opinion was similar. In her "Medical Source Statement Of Ability To Do Work-Related Activities," Dr. Gooden noted plaintiff could: 1) lift up to twenty pounds on an occasional basis; 2) sit for one hour without interruption, for a total of three hours during an eight-hour shift; and 3) stand and walk for fifteen minutes at a time, though he could do neither for more than an hour per day. (Doc. 10-5 at 71-72).

To be sure, Dr. Gooden emphasized plaintiff's need to "elevate his feet often," and that his difficulties with walking and standing adversely affected his ability to obtain "gainful employment." (*Id.* at 87). But Gooden did not opine that these limitations precluded plaintiff from performing all work.

Hartford also relied on the FCE that plaintiff submitted while appealing the termination of premium-waiver benefits. According to that report, plaintiff could perform up to four hours of

sedentary work per day and occasionally sit, stand, and climb stairs. These findings were generally consistent with the restrictions Drs. Beeks and Gooden had identified.[3]

Moreover, Hartford's decision was consistent with at least parts of the SSA's disability determination. Of note is the ALJ's finding that plaintiff had the RFC to "perform sedentary work," subject to certain restrictions and limitations. (Doc. 10-5 at 63). The ALJ also gave "great weight" to Dr. Gooden's opinion "limiting the claimant to a reduced range of sedentary work[.]" (*Id.* at 67).

This evidence provides ample support for Hartford's decision that plaintiff was not disabled from performing any job – and was therefore ineligible for premium-waiver benefits.

Furthermore, Hartford's decision to reinstate plaintiff's LTD benefits while denying premium-waiver benefits tends to show that its decision-making process was reasoned and deliberate. *Glenn*, *supra*, 461 F.3d at 666. During plaintiff's appeal, Hartford received new evidence tending to undermine its earlier determination that plaintiff could work in several jobs that paid wages in excess of the LTD policy's earnings threshold. Accordingly, and appropriately, Hartford reversed course and reinstated the LTD benefits.

Finally, there is no question that Hartford's decision was "based upon a reasonable interpretation" of the respective policies. *Id.*

The LTD policy and life-insurance policy define the term "disabled" differently. Under the LTD policy, an employee able to perform some work may be "disabled" if his earnings do not exceed the policy's earnings threshold. In contrast, the life-insurance policy defines "disabled" as the inability to perform any occupation.

---

[3] The FCE did not note plaintiff's need to elevate his feet because that factor arose after the report's preparation.

9

For that reason, Hartford's decision to award plaintiff LTD benefits, but not premium-waiver benefits, has firm support in the policies' language.

Plaintiff recognizes that the policies contain different definitions, but he argues that Hartford's focus on the LTD policy's earnings requirement to justify the different outcomes is "really misdirection" because plaintiff "cannot work at any work." (*Id.* at 11).

However, nothing in the record compels the conclusion that plaintiff is disabled from performing any or all work, such that Hartford's contrary decision must have been arbitrary and capricious.

On the contrary, one of plaintiff's treating physicians opined that he was capable of performing part-time sedentary work, and the other opined that he could perform work-related activities consistent with part-time sedentary work.

Moreover, not even the SSA found that plaintiff was disabled from performing any work whatsoever. Rather, the agency determined that plaintiff could not perform "substantial gainful activity," a term of art referring (in 2010, when plaintiff's disability began) to one's ability to earn $1,000 per month. (Doc. 13 at 8). Because the life-insurance policy's definition of "disabled" is far more expansive – and thus less favorable to plaintiff – than the SSA's definition of that term, the SSA's decision did not compel Hartford to reach the same decision.

In short, substantial evidence supports Hartford's decision to deny plaintiff premium-waiver benefits.

Plaintiff raises three specific objections to Hartford's decision, but "[u]nder the arbitrary and capricious standard," none provides "a strong basis for overturning [Hartford's] determination." *Davis*, *supra*, 887 F.2d at 694.

10

### 1. Relevance of the Social Security Case

Plaintiff first argues that the SSA's decision fatally undermines Hartford's denial of premium-waiver benefits.

As plaintiff acknowledges, however, "an ERISA plan administrator is not bound by an SSA disability determination when reviewing a claim for benefits under an ERISA plan." *Whitaker v. Hartford Life & Accident Ins. Co.*, 404 F.3d 947, 949 (6th Cir. 2005). Thus, the bare fact that the SSA found plaintiff disabled did not compel Hartford to reach the same conclusion.

Furthermore, Hartford recognized that the SSA had found plaintiff disabled but explained why it reached a different conclusion.[4]

Hartford noted that it was possible for plaintiff to qualify for Social Security benefits, but not premium-waiver benefits, because "the standards governing these private and public benefits are different in critical ways." (Doc. 10-8 at 23-24).

It then explained that the availability of Social Security benefits depended on whether plaintiff could perform "substantial gainful activity," while the availability of premium-waiver benefits depended on "the consistent interpretation of the specific terms in the plan." (*Id.* at 24).

Finally, Hartford appeared to indicate that it gave more weight to "the Medical Source Statement . . . completed by Dr. Gooden and the results of the [FCE]" – which showed that plaintiff

---

[4] "There is no technical requirement to explicitly distinguish a favorable Social Security determination in every case, but if the plan administrator (1) encourages the applicant to apply for Social Security disability payments; (2) financially benefits from the applicant's receipt of Social Security; and then (3) fails to explain why it is taking a position different from the SSA on the question of disability, the reviewing court should weigh this in favor of a finding that the decision was arbitrary and capricious." *Allen v. Life Ins. Co. of N. Am.*, 504 F. App'x 435, 439 (6th Cir. 2012).

11

could perform part-time, sedentary work – than it did to the vocational expert's testimony in the SSA case that there were no jobs in the national economy that plaintiff could perform. (*Id.*).

Because the SSA definition of "disabled" is not synonymous with the life-insurance policy's definition of that term, nothing about the SSA's decision fatally undermines Hartford's decision denying premium-waiver benefits.

### 2. Failure to Consider the Record as a Whole

Plaintiff next argues that Hartford failed to consider evidence that was favorable to his disability claim. For example, plaintiff contends that Hartford erred in relying on the Employability Analysis Report and the FCE because neither report included the restriction that plaintiff must elevate his feet.

I cannot fault Hartford on that basis, however, because Dr. Gooden did not identify that restriction until mid-November, 2012, after both reports had been completed. Moreover, Hartford expressly acknowledged plaintiff's need to elevate his legs (Doc. 10-8 at 23), but gave greater weight to Dr. Gooden's opinion that plaintiff could perform physical activities consistent with part-time sedentary work.

Plaintiff also contends that Hartford should not have relied on a summary of a phone call it made to Dr. Beeks's office, at least not without a "record of how and what questions were asked." (Doc. 15 at 7).

The purpose of that call, it appears, was to reconcile Dr. Beeks's statements that: 1) plaintiff was capable of sedentary work; but 2) was "unable to work continuous." (Doc. 10-6 at 77).

12

According to Hartford's records, someone in the doctor's office clarified that plaintiff could do sedentary work, just not while sitting continuously for an eight-hour shift.[5]

Yet plaintiff has not even alleged – let alone established – that Hartford inaccurately recorded or transcribed the work-related limitations Dr. Beeks identified. Accordingly, I have no basis to conclude that Hartford acted unreasonably in considering that piece of evidence, along with rest of the voluminous administrative record, when determining plaintiff's eligibility for premium-waiver benefits.

### 3. Structural Conflict of Interest

Both sides agree that Hartford's dual role in deciding eligibility for benefits and paying claims out of its own pockets created a conflict of interest. However, they dispute the relevance of that conflict.

The Supreme Court's decision in *Glenn* provides some guidance on how courts should weigh the conflict-of-interest factor. The Court noted that a conflict "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration." *Glenn*, 554 U.S. at 517.

By contrast, the conflict "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing

---

[5] It is somewhat troubling that the "someone" to whom Hartford spoke is identified only by a first name, and there is no description of that person's role in Dr. Beeks's office. But there is no indication plaintiff could not have cured any error or mistake by obtaining a corrective statement from Dr. Beeks directly.

management checks that penalize inaccurate decision-making irrespective of whom the inaccuracy benefits." *Id.*

In this case, I do not assign meaningful weight to Hartford's conflict. While there is "nothing in the record indicates that [Hartford] has a history of biased claims administration or that the conflict otherwise affected the benefits decision" it is equally true that "nothing in the record indicates that [Hartford] has taken the kinds of steps to reduce bias and promote accuracy that were identified in *Glenn*." *Moss v. Unum Life Ins. Co.*, 495 F. App'x 583, 591 (6th Cir. 2012).

To support his conflict-of-interest claim, plaintiff argues that Hartford reversed its decision denying LTD benefits solely to ensure that Hartford could seek "a refund of $30,000 via subrogation" caused by plaintiff's award of Social Security benefits.[6]

Plaintiff's argument is speculative at best, and unseemly at worst. As Hartford accurately points out in reply, the company need not have granted LTD benefits to recoup the overpaid sum; Hartford could have simply demanded repayment, then sued plaintiff had he refused.

Moreover, Hartford's decision to award plaintiff LTD benefits exposes the company to the realistic prospect that amount of benefits it is now obligate to pay will outstrip the amount of benefits it hopes to recoup from him. Such a decision is hardly guaranteed to serve Hartford's financial interests.

Finally, in arguing that money alone – rather than the medical evidence and applicable policy language – drove Hartford's decision to grant LTD benefits, plaintiff opens himself up to charges

_____

[6] The LTD policy entitles Hartford to offset the amount of LTD benefits it paid plaintiff by the amount of Social Security benefits he receives. (Doc. 11-1 at 18-20). After the SSA found plaintiff was disabled, Hartford exercised its set-off rights and determined that it had overpaid plaintiff roughly $30,000 in LTD benefits. (Doc. 10-1 at 77-78). Hartford then indicated that it would recoup that amount from plaintiff's future LTD benefits. (*Id.* at 78-79).

that he did not apply for, and is not receiving, LTD benefits in good faith. If plaintiff is correct that only Hartford's financial interests support its decision to reinstate LTD benefits, it would appear there is no reason why plaintiff should be receiving those benefits.[7]

At all events, given the substantial evidence supporting Hartford's decision and its deliberate, reasoned decision-making process, I do not give any meaningful weight to Hartford's conflict of interest.

## Conclusion

For the reasons set forth above, it is ORDERED THAT defendant's motion for judgment on the administrative record (Doc. 12) be, and the same hereby is granted.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge

---

[7] Of course, I make no specific finding in that regard, and I defer entirely to Hartford's determination that plaintiff is "disabled" within the meaning of the LTD policy. I note the implication of plaintiff's argument only as one reason why I find no merit in it.

15